# EXHIBIT "A"

AO 91 (Rev. 11/11) Criminal Complaint

**SEALED**

FILED IN UNITED STATES DISTRICT COURT, DISTRICT OF UTAH

NOV 21 2016

D. MARK JONES, CLERK
BY_____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
for the
District of Utah

| | |
|---|---|
| United States of America<br>v.<br>ANDREW DEAN KELLEY<br><br>*Defendant(s)* | ) ) ) ) ) ) ) Case No. 2:16mj595-DBP |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __9/30/2014 through present__ in the county of __Salt Lake__ in the __Central__ District of __Utah__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 | Securities Fraud |

This criminal complaint is based on these facts:

See attached Affidavit of FBI Special Agent James Malpede

☑ Continued on the attached sheet.

_____
*Complainant's signature*

James M. Malpede, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/21/16

_____
*Judge's signature*

City and state: Salt Lake City, Utah

Dustin B. Pead
*Printed name and title*

JOHN W. HUBER, United States Attorney (#7226)
JACOB J. STRAIN, Assistant United States Attorney (#12680)
Attorneys for the United States of America
111 South Main Street, Ste. 1800 • Salt Lake City, Utah 84111
Telephone: (801) 524-5682

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. ANDREW DEAN KELLEY, Defendant. | Case No. 2:16mj 595-DBP<br><br>IN RE CRIMINAL COMPLAINT FOR ANDREW DEAN KELLEY<br><br>Magistrate Judge Dustin B. Pead |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

Complainant, who on oath deposes and says that this complaint is based on information obtained through an investigation consisting of the following:

1. Affiant is a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice. Affiant was previously employed as a Special Agent with the Internal Revenue Service Criminal Investigation Division from 1995 through 1998 in California. Affiant has been assigned to the Salt Lake City Division of the FBI since 1998 and has been assigned to the Provo Resident Agency; Supervisory Senior Resident Agent of the Ogden Resident Agency; Supervisory Special Agent of the White Collar and Public Corruption Program of the Salt Lake City Division; Chief of the Domestic Security Alliance Council and Chief of the Financial Institution Fraud Unit at FBI Headquarters in Washington, D.C.; and is currently

assigned as a Special Agent on the White Collar Crime Squad in Salt Lake City. Affiant is currently assigned responsibility for the investigation of this case.

2.  I have been assigned to investigate allegations of possible fraudulent activity conducted by ANDREW DEAN KELLEY ("Kelley"), doing business as Blackbird Capital Partners, LLC.

3.  The information in this affidavit is based on my personal knowledge, evidence developed during the investigation, and other FBI agents. Because the affidavit is submitted for the limited purpose of establishing probable cause it does not set forth each and every fact that I or others have learned during this investigation.

4.  Blackbird Capital Partners, LLC ("Blackbird") was registered as a Utah Corporation on July 1, 2015. Its registration expired as of October 26, 2016 for failure to file a renewal. The business address was 13961 South Minuteman Drive, Ste. 375 Draper, UT 84020.

5.  In June 9, 2015, Blackbird was registered with the National Futures Association ("NFA"), a private provider of regulation in the derivatives market. Blackbird's NFA membership was withdrawn effective September 4, 2016. The business address was listed as 13961 South Minuteman Drive, Ste. 375 Draper, UT 84020.

### *INVESTOR 1*

6.  An individual, to be identified in this affidavit as "Investor 1," operates a successful financial services and tax preparation firm.

7.  Around November 2015, Investor 1 met with Kelley at a restaurant where Kelley explained his career expertise in trading futures. At the meeting, Kelley made the following representations which were material to Investor 1:

    a. Kelley developed a sophisticated algorithm for trading bond futures which was ultimately purchased and used by a number of financial institutions including JP Morgan Chase and Wells Fargo Bank;

    b. Kelley had expended millions of dollars and thousands of hours developing software with algorithms which he utilized to generate high returns;

    c. Kelley created a "family and friends" trading fund which experienced great success over the last three years. Specifically, Kelley represented that Kelley generated a 300% return the first year of trading; 100% the second year; and between 50-60% the third year;

    d. Kelley claimed the "family and friends" fund had experienced only two losing months in the three-year period;

    e. Kelley claimed he was a family man and a faithful member of the LDS church;

    f. Kelley claimed each investor in Blackbird had an individual account and a brokerage firm would generate individual account statements;

    g. At no time did Kelley tell Investor 1 that the investment would be used for any other purpose other than futures trading.

8. Based on these representations, Investor 1 made an initial investment of $100,000 in November 2015. It was agreed that Investor 1 and Kelley would split the profits earned on Kelley's trading with 70% of the profits going to Investor 1 and 30% of the profits going to Kelley. At the end of 30 days, Kelley claimed Investor 1 had earned 20% on his investment, or $20,000. Investor 1 withdrew his entire investment at the end of 30 days and was paid $120,000 by Kelley.

9. Based on this apparent success, and further reports of continued success by Kelley, Investor 1 made additional investments with Blackbird in the "friends and family" fund totaling **$2,047,000** in the following increments:

    a. In February 2016, Investor 1 invested an additional $100,000;

    b. On March 11, 2016, Investor 1 invested an additional $347,000;

   c. On April 15, 2016, Investor 1 invested an additional $600,000;

   d. On May 17, 2016, Investor 1 invested an additional $1,000,000.

10. For each investment, Investor 1 wire transferred his funds from Investor 1's bank account at JP Morgan Chase to the account of Blackbird at JP Morgan Chase.

11. Between February 2016 and up and until October 2016, Kelley provided Investor 1 daily updates on Kelley's trading activity. Kelley reported a few losing trading days, but the winning days substantially outnumbered the losing days.

12. Investor 1 created an Excel spreadsheet to track the investment performance as represented by Kelley. Investor 1 emailed this spreadsheet to Kelley each month to confirm investment performance and Kelley would routinely make corrections and email the spreadsheet back to Investor 1.

13. By October 2016, Kelley reported to Investor 1 that his $2,047,000 investment had grown to approximately $2.7 million.

14. Around October 1, 2016, Investor 1 requested the withdrawal of $1.7 million from the investment. Kelley began stalling and making excuses as to why the money was not available for transfer.

15. On October 7, 2016 at 6:15pm, Kelley met with Investor 1 at a park. Investor 1 recorded the conversation, the relevant portion unfolding as follows:

  Kelley: Um, [Investor 1], I have screwed up.

  Investor 1: Okay

  Kelley: Um, I just want you to know, um, a couple things. I will make you whole and then some. . . .

  Investor 1: What's happened? . . . .

  Kelley: Listen, when Brexit happened, I lost a lot of my money, I lost a lot

|   |   |
|---|---|
| | of your money, and I lost a lot of [another investor's] money . . . . |
| Kelley: | I do not have your money. I have about 300 grand left to my name. I've lost $6 million. You have my word, which isn't worth anything right now, that I will take care of this. I can get you whole in a number of different ways. If you go to the authorities or whatever that's just gonna harm my ability to get it back. But um, you have the right to do anything you wanna do. And I would not hold it against you whatever you do to me at this point. |
| Investor 1: | But you knew it though . . . . constant lies . . . . You could be like ... this is what happened. |
| Kelley: | I just felt that would kill my ability to make it back somewhere else. . . . |
| Kelley: | I've turned into a compulsive liar because of what's happened over the last 90 days. . . . |
| Investor 1: | When did it happen? |
| Kelley: | Brexit, we kinda had a three way move and I, uh, haven't been able to make it up. . . it was before I got your second million . . . I lost about $6 million in one night. |
| Kelley: | I am more sorry than you will ever understand. I've been literally contemplating suicide for the last three days to think about how my life insurance can take care of you, [another investor], and my family, and uh, that's really all I have to say. |
| Kelley: | You have a child coming. It makes me sick that I've done this to you with a child coming. Makes me sick that I lie. I've turned into a person that I can't look at in the mirror. |
| Kelley: | The magnitude of what I've done, honestly, didn't hit me until recently, because I've always been able to make it right... |

16. On October 10, 2016, in another recorded conversation with Investor 1, Kelley admitted he lied to Investor 1 explaining the losses were not the result of Brexit, but instead Kelley had used Investor 1's funds to "plug old holes" and pay other investors due to trading losses (i.e. Ponzi payments). Specifically, Kelley admitted at least $400 thousand of Investor 1's money "went to fill holes."

17. On October 10, 2016, Investor 1 confronted Kelley regarding his pattern of fraud and Kelley responded by saying, "I am delusional. I am a compulsive liar. I am all those terrible things. I have turned into a monster. You have been nothing but great to me."

18. Kelley has continued to represent to Investor 1 that Kelley would be able to raise money and "trade his way out of it" to pay back Investor 1 if Investor 1 would not report him to the authorities.

19. Kelley provided bank and trading records to Investor 1. A review of those records by your affiant support Kelley's admissions about using new investor money to pay old investors. The records also show substantial trading losses.

20. In addition to Kelley's threat to commit suicide as detailed above, Kelley has made the following statements in recorded conversations that suggest that he poses a significant suicide risk:

   a. "I'm just basically in a scenario where I have to get the money or die, to be honest."

   b. "I have to live with everything I've done, and I understand that. It is killing me."

   c. "So there are a lot of ways out of this. I can't even live with myself. I literally -- I've already lost a ton of weight, and I'm sure you have as well, because I haven't eaten really since we talked on Friday."

   d. "I'm sick especially if I hurt your relationship with your wife. I'll never live with myself for that."

   e. "The money is one thing, but, you know, if I destroyed someone's life, I -- you know, I should be dead."

## *INVESTOR 2*

21. Investor 2 and a few of Investor 2's children invested with Blackbird in the "family and friends" fund in late 2014. From September 30, 2014 through October 11, 2016 they invested approximately $1.1 million.

22. Statements Investor 2 received from Blackbird show a total current value of approximately $1.7 million.

23. On November 9, 2016, Investor 2 called Kelley to discuss the investment with Blackbird. Investor 2 recorded the conversation, the relevant portion transcribed as follows:

> Investor 2: I'm thinking of maybe increasing our retirement amount. Uh, it's been quite successful so... But I need to know, where are we at, how are things going? Bring me up to date.
>
> Kelley: Well, we feel very good. We obviously, from a, you know, a pure market perspective, we like, you know, what happened in the election. But we feel like the election was gonna bring us volatility regardless. . . . Overall we feel good about things. We, uh, we look, you know, more positively on this last year between February and here wasn't, you know, wasn't a great market for us. It was a slow grind. Now we're getting into the volatility that we like . . . .
>
> Investor 2: Okay, so, you feel like the returns and stuff will remain at least the same or around the same?
>
> Kelley: Yes, potentially better, but at least the same. I mean I do, um, you know. We take everything, uh, somewhat of a conservative approach. I know that sounds crazy with the returns we provide. But you know, as a trader, I do more on my own money than that. But I temper it for customers because customers generally can't handle the big draw downs.
>
> ...
>
> Investor 2: Do you mind if I give your phone number out to [potential investors] and have them...
>
> Kelley: Yeah, no, I appreciate that very much. That's uhh, you know, I couldn't appreciate it more. The fund we're in with you guys right now I wouldn't be able to allow them in. It's only for people we know closely. But we have another fund that's a public fund. . . .
>
> ...

| | |
|---|---|
| Investor 2: | Is our fund performing the same [as Blackbird's other funds]? |
| Kelley: | Over time yours performs better. The new one was launched with smaller money so it performed, uh better at first, but once they get to the same amount of money they perform the same. |
| | … |
| Investor 2: | How much money do we have out there. I mean everything combined, just out of curiosity. |
| Kelley: | About 13 million. |

### *UNDERCOVER AGENT*

24. On November 15, 2016, Undercover Agent contacted Andrew Kelley expressing interest in investing money with him.

25. Undercover Agent recorded the call the relevant portion transcribed as follows:

| | |
|---|---|
| Kelley: | About 3 years ago, I started what I call the exempt "friends and family" fund. We trade U.S. futures, oil, gold, S&P mini, some currency futures as well. . . . I trade about $30 million. . . . I look to provide my clients 4-8% per month after my fee. . . . You have to have at least $2 million to do business with us. |

26. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that between approximately late 2014 and up and until the present, ANDREW DEAN KELLEY devised and intended to devise a scheme to defraud investors, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and omissions of material facts.

27. In executing and attempting to execute the scheme and artifice to defraud, and in furtherance thereof, KELLEY knowingly offered and attempted to offer securities, that is, investments in Blackbird Capital Partners, LLC, and by the use of means and instruments of transportation and communication and interstate commerce, that is, wire communications, directly and indirectly, and did willfully (1) employ a device, scheme, and artifice to defraud; (2) make untrue statements of material fact and omit to state material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engage in acts, transactions, practices, and courses of business which would operate and did operate as a fraud and deceit upon other persons, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Securities Fraud).

28. I therefore request that this Court issue a criminal complaint and arrest warrant charging ANDREW DEAN KELLEY with a violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

James M. Malpede
Special Agent
Federal Bureau of Investigation

APPROVED:

JOHN W. HUBER
United States Attorney

JACOB J. STRAIN
Assistant United States Attorney

SUBSCRIBED AND SWORN TO BEFORE ME this 21st day of Nov., 2016.

DUSTIN B. PEAD
United States Magistrate Judge