IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                       Plaintiffs,<br>vs.<br><br>BLACKBIRD CAPITAL PARTNERS, LLC, a Nevada limited liability company; ANDREW D. KELLEY, an individual; and PAUL H. SHUMWAY, an individual,<br><br>                     Defendants. | ORDER AND MEMORANDUM DECISION<br><br>Case No. 2:16-cv-01199-TC |

On November 28, 2016, the S.E.C. brought this lawsuit against Defendants Andrew Kelley, Paul Shumway, and Blackbird Capital Partners, LLC ("Blackbird"), alleging they had violated various securities laws. (ECF No. 1.) The court entered final judgments against Mr. Kelley, Mr. Shumway, and Blackbird on March 29, 2019. (ECF Nos. 94, 95, 97.) So far, the S.E.C. has been able to recover $2,372,259.32 under those judgments, which must now be distributed to the Defendants' victims.

On February 28, 2020, the S.E.C. filed a motion to appoint distribution agent and approve distribution plan. (ECF No. 117.) The S.E.C. proposes dividing the recovered funds between sixty-seven defrauded investors on a pro rata basis. (ECF No. 117-1.)

The court has received objections to this plan from the following individuals: (1) Shane Stockwell (ECF No. 126); (2) Bryce Zundel (ECF No. 125); (3) B. Ray Zoll (ECF No. 129); and (4) a group of eighteen investors in X-1 Technologies, LLC[1] (the "X-1 Investors") (ECF No. 130). A fifth objection, from Lindsey Stewart, was filed and then withdrawn. (ECF Nos. 133, 135.)

Having reviewed all of the materials filed by the S.E.C. and the objectors,[2] and having considered all arguments made at the July 1, 2020 hearing, the court now sustains the objection of Mr. Stockwell and overrules the objections of Mr. Zundel, Mr. Zoll, and the X-1 Investors. For the reasons stated below, the S.E.C.'s motion to appoint a distribution agent and approve the distribution plan is granted.

## BACKGROUND

Because the inquiry below is fact intensive, the court provides only a broad overview of the background here. Mr. Kelley was a futures and commodities trader who claimed to have a proprietary trading algorithm that ensured a significant return on investment. (Cash Dep. at 13:15-14:2, 15:16-24; Neff Dep. at 34:12-21.) But Mr. Kelley needed a securities license to trade on behalf of others, so in 2013, he partnered with Mr. Shumway—who had a Series 3 license—to create Blackbird. (Zoll Dep. at 26:18-27:6; Zundel Dep. at 24:19-25:16.) Blackbird

---

[1] The X-1 Investors are Brad Andrus, Mark Burgess, Stuart Burgess, Don Cash, Clancy ROAC, LLC, Jeff Collinsworth, Curtis Cook, Matt Hand, Karl Hillyard, Jake Hinkins, Marc Miller, Ricardo Pazos, James Ritchie, Stapp Investments, L.C., Shane Stockwell, Tee & See Marketing, Inc., B. Ray Zoll, and Bryce Zundel. These same parties previously sought to intervene in this action but the court denied their request and instead instructed them to seek relief by objecting to the distribution plan. (See ECF Nos. 40, 98, 100, 113.)

[2] In addition to the motion and the four objections, the court has reviewed (1) the S.E.C.'s reply brief (ECF No. 131); (2) the X-1 Investors' authorized sur-reply (ECF No. 138); (3) Mr. Zundel's unauthorized sur-reply (ECF No. 136); (4) certain declarations submitted by the S.E.C. at the outset of the hearing (ECF No. 140); and (5) the full deposition transcripts of Brad Andrus (ECF No. 144-1), Don Cash (ECF No. 144-2), Brandon Neff (ECF No. 144-3), Greg Young (ECF No. 144-4), B. Ray Zoll (ECF No. 144-5), and Bryce Zundel (ECF No. 144-6), which the court ordered the S.E.C. to file after the hearing (ECF Nos. 141).

would solicit investments from third parties, whose funds would then be traded by Mr. Kelley in exchange for a percentage of the profits.  (Compl. ¶¶ 11-17; Zoll Dep. at 59:14-60:12; Zundel Dep. at 19:5-9.)

In early 2016, Mr. Kelley suffered significant trading losses.  At the same time, a criminal investigation involving one of Mr. Kelley's acquaintances damaged Blackbird's reputation.  (Andrus Dep. at 16:20-17:16; Neff Dep. at 26:19-23, 41:20-42:3; Zoll Dep. at 38:13-39:21, 70:5-10.)  In reaction to these events, a group of investors worked with Mr. Kelley and Mr. Shumway to create X-1 Technologies, LLC ("X-1"), a new entity intended to replace Blackbird.  X-1 was created in June 2016 and the investors began taking their money out of Blackbird and placing it into X-1.  (Neff Dep. at 130:2-15; Young Dep. at 81:3-82:8; Zoll Dep. at 84:15-23.)  But in October 2016, before this process was complete, the investors learned that Blackbird had again suffered debilitating losses.  A few weeks later, Mr. Kelley was arrested and charged with securities fraud.  U.S. v. Kelley, 2:16-cr-630-DB (Utah 2016).[3]

Meanwhile, on November 28, 2016, the S.E.C. filed this civil action against Mr. Kelley, Mr. Shumway, and Blackbird, alleging that Mr. Kelley had been using Blackbird to run a Ponzi scheme.  (Compl. ¶¶ 47-48.)  Shortly after the complaint was filed, the court froze all assets that might have been involved in the scheme, including all of X-1's assets.  (ECF Nos. 8, 16, 34-35.)  The court must now determine how to equitably distribute these and other assets to the victims of Mr. Kelley's fraud.

To determine how best to distribute these assets, the court looks in part to the relationship between all of the various entities and accounts that Mr. Kelley used in his scheme.  The word

---

[3] Mr. Kelley ultimately pled guilty on April 18, 2017, and was sentenced to eighty-four months in prison.  See U.S. v. Kelley, 2:16-cr-630-DB (Utah 2016) at ECF Nos. 31, 53.

"account" has multiple meanings in the context of this case and the parties do not always use the word consistently in their briefs and depositions. Accordingly, the court briefly summarizes the types of accounts at issue here.

First, "account" may simply refer to a standard bank account. The bank accounts that are most relevant to this case are Blackbird's checking account at Chase Bank and X-1's checking and savings accounts at America First Credit Union (AFCU). The phrases "Blackbird's account" and "X-1's account" are most often used by the parties to refer to these bank accounts.

"Account" may also refer to a trading account. These are accounts opened at certain third-party financial institutions for the purpose of making futures and commodities trades. At various times, Mr. Kelley used trading accounts at Wedbush Securities, Gain Capital, Dorman Trading, Advantage Futures, and TradeStation Securities.

Investments needed to be placed in a trading account before Mr. Kelley could trade with them. This generally happened in one of two ways. First, investors could deposit funds directly into Blackbird's Chase account, through a check or wire order. All of the investors' money would be intermingled in that one bank account. Mr. Kelley or Mr. Shumway would then transfer some or all of that money from the Chase account to a trading account. Later, once X-1 was created, the same system was used: investments would all go first into the AFCU bank account, and then from there would be transferred to Mr. Kelley's Advantage Futures trading account. Investors who used this system would have to rely on financial statements produced by Mr. Kelley or Mr. Shumway to know the status of their investments.

Alternatively, investors could open their own Futures Commission Merchant (FCM) accounts directly with one of the third-party financial institutions identified above. According to

the S.E.C., twenty-two investors opened FCM accounts with Wedbush Securities and forty-eight investors opened FCM accounts with Gain Capital.  (S.E.C. Reply, Ex. A, Oliver Decl. ¶¶ 3-4.) After opening an FCM account, the investors signed authorizing documents that granted Mr. Kelley access to these accounts so that he could trade money on their behalf.  By using FCM accounts, the investors were able to keep their money separate from other investors' money, rather than let it be commingled in a single bank account with other investors.  Additionally, FCM accounts gave investors access to financial statements about their investments that were produced independently by Wedbush Securities and Gain Capital, rather than by Mr. Kelley or Mr. Shumway.

Finally, in addition to bank accounts and trading accounts, the word "account" was sometimes used by Mr. Kelley and Mr. Shumway to distinguish internally between different groups of investors.  The most important example of "account" being used in this manner is the Friends & Family Account.  The Friends & Family Account refers to a group of investors who were close to Mr. Kelley and whose money was allegedly being traded in a different, more advantageous manner than other investors.  As discussed in more detail below, there may have also been another grouping (or, at least, certain investors may have been led to believe there was another grouping), modeled after the Friends & Family Account so that it would receive similar preferential treatment.  The court refers to this as the "Neff & Young Account," after the investors involved in it.  Lastly, instead of referring to the Chase bank account, the phrase "Blackbird Account" is sometimes used by the parties as a catch-all term to refer to anyone who invested in Blackbird but was not part of the Friends & Family Account or the Neff & Young Account.  To be clear, none of these were actually separate "accounts" in any meaningful,

5

objective sense; rather, these were identifiers used by Mr. Kelley and Mr. Shumway to distinguish between certain investments for purposes of their own, internal accounting.

The S.E.C.'s distribution plan, with one exception, would treat all investors the same, regardless of whether the investor believed their funds were part of the Friends & Family Account, the Neff & Young Account, or the generic Blackbird Account, and regardless of whether the investors gave their money to Blackbird or to X-1.  The plan would, however, exclude all of the investments made through FCM accounts, because those funds were never commingled with other investments.

The objectors raise three challenges to the distribution plan.  First, Mr. Stockwell argues that the S.E.C. failed to account for the full amount of his Blackbird investment, and so must adjust the plan to reflect those funds.  Second, Mr. Zundel claims that the money he placed in his FCM account actually was commingled with other accounts and so should be included in the distribution.  And finally, Mr. Zoll and the X-1 Investors contend that Blackbird and X-1 must be treated as legally separate enterprises.  They ask the court to segregate the X-1 investments from the Blackbird investments and allow the X-1 investments to be traced back to each individual investor rather than be part of the pro rata distribution being made to all investors.

## LEGAL STANDARD

"In general, this Court has broad authority to craft remedies for violations of the federal securities laws. . . .  The Court has the authority to approve any [distribution] plan provided it is fair and reasonable."  S.E.C. v. Byers, 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009) (internal quotation omitted) (collecting cases).  In exercising its discretion, the court "should give substantial weight to the S.E.C.'s views regarding a plan's merits."  S.E.C. v. McGinn, Smith &

Co., Inc., Case No. 1:10-cv-457 (GLS/CFH), 2016 WL 6459795 at *2 (N.D.N.Y. Oct. 31, 2016) (internal quotations omitted).

Courts frequently favor a pro rata distribution of funds and disfavor attempts to trace losses to individual investors.  See S.E.C. v. Quan, 870 F.3d 754, 762 (8th Cir. 2017) ("Courts have 'routinely endorsed' the pro rata distribution of assets to investors as the most fair and equitable approach in fraud cases.") (collecting cases); S.E.C. v. Wealth Mgmt. LLC, 628 F.3d 323, 333 (7th Cir. 2010); S.E.C. v. Credit Bancorp, Ltd., 290 F.3d 80, 88 (2d Cir. 2002).  Courts generally consider three factors when determining whether to approve a pro rata distribution plan: (1) Was there a single, unified scheme to commit fraud? (2) Were the defrauded victims similarly situated? And (3) have funds been commingled across multiple accounts?  See Credit Bancorp, Ltd., 290 F.3d at 88-89; S.E.C. v. J.P. Morgan Sec., LLC, 266 F. Supp. 3d 225, 231 (D.D.C. 2017); S.E.C. v. Founding Partners Capital Mgmt., Case No. 2:09-cv-229-FTM-29SPC, 2014 WL 2993780 at *6 (M.D. Fla. July 3, 2014).[4]

On the other hand, where the victims were not treated similarly, and where the losses of individual investors can be accurately traced, a more individualized distribution may be appropriate.  See, e.g., S.E.C. v. Bivona, Case No. 16-cv-1386-EMC, 2017 WL 4022485 at *7-8 (N.D. Cal. Sept. 13, 2017); U.S. v. Ovid, Case No. 09-CR-216(JG)(ALC), 2012 WL 2087084 at *6-7 (E.D.N.Y. June 8, 2012).  But the fact that some investors can trace their losses is generally not a reason, by itself, to depart from a pro rata distribution, because courts must avoid favoring

---

[4] The borders between these factors are often hazy.  One court, for example, has suggested that the existence of similarly situated victims proves that there was a unified scheme, see Byers, 637 F. Supp. 2d at 180-81, while another has stated that the existence of a unified scheme proves that the victims were similarly situated, see McGinn, Smith & Co., 2016 WL 6459795 at *3.  Meanwhile, courts have characterized the commingling factor as both mandatory, see Byers, 637 F. Supp. 2d at 177, and optional, see Founding Partners Capital Mgmt., 2014 WL 2993780 at *7.

some similarly situated investors over others.  See U.S. v. Wilson, 659 F.3d 947, 956 (9th Cir.

2011); Bivona, 2017 WL 4022485 at *7-8.

## ANALYSIS

### I.    Shane Stockwell

The first objector, Mr. Stockwell,[5] contends that the S.E.C. failed to properly account for

certain investments he made in the Friends & Family Account.  The S.E.C. agrees that Mr.

Stockwell made a $90,000 investment that was improperly left out of the distribution plan.

(S.E.C. Reply, Ex. A, Oliver Decl. ¶¶ 26-27.)  Accordingly, Mr. Stockwell's objection is

SUSTAINED.  The S.E.C. is ordered to amend the distribution plan to include this loss.

### II.    Bryce Zundel

Mr. Zundel is one of the seventy individuals who opened FCM accounts and then

authorized Mr. Kelley to use that account to make trades.   (Zundel Obj., Ex. A.)  Mr. Zundel

objects to the S.E.C.'s recommendation that all FCM accounts be excluded from the distribution

plan.  He asks that the losses he experienced in his FCM account be included as part of his

recovery.

Mr. Zundel initially invested $350,000 in a Wedbush Securities account.  (See Zundel

Obj., Ex. B at 2-9.)  Later, in order to move the money to X-1, he asked to withdraw whatever

remained of his investment.  Mr. Shumway provided Mr. Zundel with a check from Gain Capital

for $65,530.85.  (Id. at 10.)  Mr. Zundel requests that $284,469.15—the difference between his

---

[5] All three individual objectors—Mr. Stockwell, Mr. Zundel, and Mr. Zoll—are also X-1 Investors.  They are represented by counsel as part of the X-1 Investors' objection but are representing themselves for purposes of their personal objections.

initial $350,000 investment and the $65,530.85 he ultimately received—be added to the distribution plan on his behalf.[6]

## A. Commingling

The S.E.C. argues that the FCM accounts should not be part of the pro rata distribution because each account was kept separate, meaning there was no commingling of assets among different investors. Mr. Kelley had access to each individual FCM account, used the money from these accounts for futures trading, lost a significant amount of money as part of that trading, but money from one account was never used to make up for losses in another account.

Mr. Zundel disputes this. He cites deposition testimony from two of his fellow investors, Brandon Neff and Ray Zoll, as evidence that the FCM accounts were all pooled together.[7] But Mr. Zundel takes their testimony out of context to make this argument. For example, he quotes Mr. Neff as having said, "I believe it was pooled with other funds though. I believe that's what they said." (Neff Dep. at 13:13-14.) But this statement was actually about money that Mr. Neff transferred directly to Blackbird's Chase account, not money placed in an independent FCM account. (See Neff Dep. at 12:19-15:8.)[8] In fact, Mr. Neff testified that he never even opened an

---

[6] In his sur-reply, Mr. Zundel states that he invested only $250,000 with Wedbush Securities, not $350,000, which means that he is owed $184,469.15, not $284,469.15. (See Zundel Sur-Reply at 1, 2, 5.) Mr. Zundel never explains this change. On the one hand, his deposition testimony also suggests that he only invested $250,000. (Zundel Dep. at 21:9-22:4.) On the other hand, the exhibits that he has submitted to the court, which show his wire transfers to the account, appear to confirm that his original investment was indeed for $350,000. (See Zundel Obj., Ex. B at 2-9.) Ultimately, the court need not resolve this discrepancy because it is overruling Mr. Zundel's objection.

[7] Brandon Neff was a Blackbird investor. (Neff Dep. at 12:19-13:21.) He also helped found X-1 and intended to eventually invest with X-1 but he had not yet done so when Mr. Kelley was arrested and the accounts were frozen. (Id. at 42:4-45:14.) Accordingly, he is not one of the X-1 Investors who filed an objection. Meanwhile, Ray Zoll was legal counsel for, and an investor in, Blackbird. (Zoll Dep. at 15:25-16:12, 19:22-20:23.) He also drafted the operating agreement for X-1 and became an X-1 investor. (Id. at 69:25-71:23, 83:3-86:5.)

[8] As discussed in more depth below, it appears Mr. Neff was referring in this instance to an investment he had made in the Friends & Family Account. (See Neff Dep. at 29:16-30:1, 32:3-13.)

FCM account with either Wedbush Securities or Gain Capital, so he would have no knowledge about how the FCM accounts worked.  (Id. at 28:7-19.)

As for Mr. Zoll's testimony, Mr. Zundel claims that when asked, "[W]as it your understanding that those funds were pooled together with other investor accounts at Wedbush[,]" Mr. Zoll responded, "Yes."  (Zoll Dep. at 41:20-23.)  But Mr. Zoll was referring only to his understanding of the FCM accounts early on, an understanding that he later concluded was mistaken.  His full response to that question was "[y]es.  I came to learn sometime after that they weren't all pooled, that Andrew [Kelley] and Mr. Shumway would select certain groups, that I didn't know at the beginning he did, to invest different amounts in different investments."  (Zoll Dep. at 41:20-42:2.)

Accordingly, neither Mr. Neff's testimony nor Mr. Zoll's testimony is evidence that the FCM accounts were commingled.

In addition to this deposition testimony, Mr. Zundel points out that he invested in a Wedbush Securities account, while the check he ultimately received from Mr. Shumway came from a Gain Capital account.  (Zundel Obj., Ex. B at 10.)  Mr. Zundel asserts that he never created a Gain Capital account.  (Zundel Sur-Reply at 4.)  He argues that this proves that funds from one account were being used to cover the debts of other accounts.

The court concludes that the check alone is not evidence of commingling.

First, Mr. Zundel's claim that he did not open a Gain Capital account is unsubstantiated. Mr. Zundel's records show that on April 1, 2016, the full balance of his Wedbush Securities account was transferred to a Gain Capital account.  (See Zundel Sur-Reply, Ex. E.)  And although he claims that he does not remember personally moving the funds from Wedbush

10

Securities to Gain Capital, he repeatedly expressed confusion during his deposition about the difference between these entities.  For example, Mr. Zundel initially testified that he invested $250,000 with Wedbush Securities (Zundel Dep. at 19:10-23, 21:9-22:7), but then stated that when he wanted to review statements for that investment, he would log in to his Gain Capital account (id. at 26:11-23, 27:3-21).  And it was Mr. Zundel, not his questioner, who first brought up Gain Capital's name during the deposition as an entity that Mr. Zundel believed he had worked with.  (Id. at 26:11-18.)  Later, he seemed to express a belief that Wedbush Securities and Gain Capital were the same entity, or at least that he was confused about which entities he was affiliated with:

> Q.  And when you say Gain Capital, is that something you had in addition to Wedbush, or . . .
>
> A.  No.  It was all the same.  It's all related to Blackbird.

(Id. at 28:2-6.)

Notably, Mr. Zundel is not alone in being confused about the location of his FCM account.  Mr. Zoll's deposition testimony was similarly uncertain about the various entities:

> Q.  [D]o you recall that you closed your Wedbush account at some point?
>
> A.  Didn't they – didn't they turn that – that was [the] FCM account and they got another FCM in place?  That's what I vaguely thought happened.  At some point Wedbush, they converted to another FCM, and maybe that's what I'm thinking, is that that account was shut down and reopened in another FCM.  I am pretty sure there was another FCM that took over Wedbush.
>
> Q.  So on Exhibit 7, if you look at the bottom, that e-mail header that we don't have the e-mail for.  It indicates it's from Gain Capital and shows a daily client statement.  Is that what you're talking about is Gain Capital?
>
> A.  That's what I think I'm talking about. . . .  I do recall now that a rollout of Web into – into Gain, and I think that's the – what I must be talking about, the shut down of the Wedbush account into the Gain account. . . .

11

Q.  Do you recall doing paperwork for Gain Capital so that you could set up an account like the one you had at Wedbush?

A.  I don't.  It may have happened through that time. . . .  But I'm sure that when we switched to Gain, they would have sent me their new paperwork.  I just don't recall doing the switch.  But I remember that there was a switch in the mix.

Q.  And do you think that you did indeed switch your money from Wedbush to Gain Capital?

A.  I don't have a specific recall of it.  But I would imagine that I did, because I do recall discussions about they didn't like Wedbush and that Gain was a better FCM and that I knew there was discussions of switching.  I just don't remember honestly switching myself.  But I must have.

(Zoll Dep. at 53:2-54:17.)

Like Mr. Zundel, Mr. Zoll does not remember specifically authorizing a transfer between Wedbush Securities and Gain Capital.  But he does remember that such a transfer was being discussed by Mr. Kelley and Mr. Shumway.  All of this evidence supports the conclusion that Mr. Zundel's funds were moved from Wedbush Securities to Gain Capital, which would explain why Mr. Zundel received the check from Gain Capital.[9]

It is admittedly unclear whether Mr. Zundel personally authorized the transfer between Wedbush Securities and Gain Capital or whether Mr. Kelley and Mr. Shumway were able to independently arrange that transfer.  But the fact that money was moved from Wedbush Securities to Gain Capital does not itself show that money from any one FCM account was commingled with money from any other FCM account.  Absent further evidence, the most rational inference is that the money from each account was moved directly from Wedbush

---

[9] Mr. Zundel additionally submits an email from someone affiliated with Gain Capital, who told Mr. Zundel that there was no record of Gain Capital having an account in Mr. Zundel's name.  (Zundel Sur-Reply, Ex. G.)  But given Mr. Zundel's own recollection of accessing a Gain Capital account, and given the S.E.C.'s evidence that he did have a Gain Capital account (see S.E.C. Reply, Ex. A, Oliver Decl. ¶ 4, Ex. 2), the court finds this email unpersuasive.

Securities to Gain Capital without any commingling between accounts, and that the check Mr. Zundel received was an accurate reflection of all that was left in his own account.

### B. Similarly Situated Victims

The S.E.C. also justifies excluding the FCM accounts from the distribution plan by arguing that the FCM investors were not similarly situated with other Blackbird investors. Wedbush Securities and Gain Capital provided individualized financial statements for each FCM account. The FCM investors could monitor their investments and if the statements alerted them to serious losses, they could withdraw their investments at any time. (See Zundel Dep. at 26:19-20, 28:2-14; S.E.C. Reply, Oliver Decl. ¶ 6, Ex. 4.) Blackbird investors, by contrast, typically received updates on their investments directly from Mr. Kelley or Mr. Shumway, and representations about how the investments were doing were often false, which made it harder for the investors to realize that anything was wrong. (See Neff Dep. at 13:22-14:22, 20:16-21:20, 23:1-15, 28:24-31:6; Young Dep. at 13:7-22, 19:19-20:14; Zoll Dep. at 61:13-63:11.)

The court agrees that this provides an additional reason to treat the FCM accounts differently in the distribution plan. Notably, Mr. Zundel is the only investor to object to the S.E.C.'s proposed exclusion of the FCM accounts. Presumably, if any of the other seventy investors had identified discrepancies in their individual statements, whether in the form of commingling or any other wrongdoing, they would have also objected. The lack of any other objections suggests that the safeguards in place for the FCM accounts were effective. The other FCM investors apparently recognize that even though they may have suffered trading losses, they were not defrauded in the same way as other Blackbird or X-1 investors.

For all of the above reasons, the court agrees with the recommendation of the S.E.C. that the FCM accounts should be excluded from the distribution plan.  Mr. Zundel's objection is accordingly OVERRULED.

## III.   <u>X-1 Investors</u>[10]

The X-1 Investors argue that the funds from the X-1 account should be excluded from the distribution plan.  The X-1 Investors contend that this account was not part of Mr. Kelley's scheme and so should be returned to the X-1 Investors in its entirety rather than be shared with the defrauded Blackbird investors.

The S.E.C. responds that the X-1 account was merely an outgrowth of Blackbird. Accepting the X-1 investors' argument, according to the S.E.C., would wrongfully favor the X-1 investors over other victims of Mr. Kelley's fraud.

### A.  Relationship Between Blackbird and the Friends & Family Account

Most of the evidence detailed below involves X-1's relationship with Blackbird.  But the X-1 Investors argue that such a relationship is irrelevant because Mr. Kelley's Ponzi scheme involved only the Friends & Family Account, not Blackbird as a whole:

> Although Blackbird was solely run and operated by [Mr.] Shumway and [Mr.] Kelley, all investors in Blackbird signed subscription agreements and it was a legitimate trading company traded in its own clearing house.  It was not connected to the Ponzi scheme discovered in the Friends & Family Account that was operated by [Mr.] Kelley.

(X-1 Obj. at 4.)

Accordingly, before addressing the relationship between X-1 and Blackbird, the court must first examine the relationship between Blackbird and the Friends & Family Account.

---

[10] Mr. Zoll's objection simply reiterates the same arguments made in the X-1 Investors' objection.  Accordingly, the court's conclusions regarding the X-1 Investors' objection apply equally to Mr. Zoll's objection.

The sole evidence cited by the X-1 Investors for the proposition that Blackbird and the Friends & Family Account were kept separate is a declaration from Mr. Zundel, which states, "It was my understanding that there was no connection between Blackbird and [Mr.] Kelley's trading on behalf of family and close friends (the 'Friends and Family Account'). [Mr.] Shumway told me he was not involved with trading for the Friends and Family Account and that all Blackbird funds were traded in its own clearing house." (X-1 Obj., Ex. A, Zundel Decl. ¶ 4.) This is consistent with Mr. Zundel's deposition testimony, where he repeatedly explained that, as he understood it, Blackbird and the Friends & Family Account were distinct enterprises. (See, e.g., Zundel Dep. at 16:25-17:18; 50:8-15.)

But the evidence shows that the Friends & Family Account was never really kept separate from Blackbird. For example, one investor, Spencer Tyndale, declared that he and his mother, brother, and two sisters each invested in the Friends & Family Account. (S.E.C. Reply, Ex. B, Tyndale Decl. ¶¶ 5-6.) In order to invest, they had to deposit their money into Blackbird's account at Chase bank—the same account where all other Blackbird investments went. And they each received monthly financial statements from Mr. Shumway, which showed that the Tyndales had invested in Blackbird, not in a separate Friends & Family Account. (Id. at ¶¶ 13-15.)

Similarly, when Mr. Neff first invested with Mr. Kelley, he also wired his money to the Chase account and he received statements from Mr. Shumway. (Neff Dep. at 12:19-13:4, 14:1-13.) Mr. Neff identified this as an investment in the Friends & Family Account. (Neff Dep. at 32:3-20, 86:9-19, 176:2-16.)

Later, Mr. Neff and one of his friends, Greg Young, jointly made a much larger investment with Blackbird. At this point, Mr. Neff believed that his original investment was

being transferred out of the Friends & Family Account and being placed into a new, separate

account.  This new account (the "Neff & Young Account") would be just for Mr. Neff, Mr.

Young, and anyone else they brought in as investors.  (Neff Dep. at 16:10-19:5, 58:24-60:15,

150:16-151:1.)[11]  Mr. Young, like Mr. Neff, believed that he and Mr. Neff had their own special

account that was distinct from the Friends & Family Account.  (Young Dep. at 34:18-35:16;

59:11-60:2.)  As with the Friends & Family Account, anyone investing in the Neff & Young

Account had to first deposit their funds directly into Blackbird's account at Chase Bank.  (Neff

Dep. at 60:16-24.)

The line between the original Friends & Family Account and the new, Neff & Young

Account was hazy.  Mr. Zoll, for example, testified that he invested in the Friends & Family

Account (like others, by depositing money in the Chase account) and that he was unaware of any

kind of separate Neff & Young Account.  (Zoll Dep. at 51:13-25, 52:4-13, 57:25-59:17, 61:1-9,

68:23-69:1.)  But he also testified that Mr. Neff was the "gatekeeper" for the Friends & Family

Account, which sounds more like the role Mr. Neff played for the Neff & Young Account.  (Id.

at 34:17-35:11.)  And Mr. Young explicitly testified that Mr. Zoll's investment was actually part

of the Neff & Young Account, not the Friends & Family Account.  (Young Dep. at 57:15-23.)

Even Mr. Zundel—who maintained both in his declaration and in his deposition that

Blackbird and the Friends & Family Account were totally separate—apparently recognized that

the money involved was all pooled together.  Beginning in October 2016, Mr. Zundel agreed to

---

[11] None of the parties use the phrase "Neff and Young Account," in part because it is not clear whether such an account ever actually existed.  The court merely uses the phrase for convenience, to try and distinguish between different accounts that the parties discussed in their depositions under multiple names.  While Mr. Neff is mostly consistent in discussing the Friends & Family Account as being separate from the Neff & Young Account, his deposition occasionally conflates the two.  For example, when asked where a certain investor, Jason Meyer, placed his funds, Mr. Neff responded, "I believe that was put in the same Friends & Family account, or whatever it's called.  That account, our account."  (Neff Dep. at 67:24-68:5.)

go through the financial information for the Friends & Family Account to try and help Mr.

Kelley account for his losses.  Consistent with what the other investors have stated, Mr. Zundel

testified that all of the records he reviewed came from that same Chase account where

everyone's investments were intermingled.  (Zundel Dep. at 57:16-60:8.)  And he testified that

the only Friends & Family Account investments that he was able to review before Mr. Kelley

was arrested were those of Mr. Kelley, Mr. Shumway, Mr. Neff, and Mr. Young—even though

Mr. Shumway supposedly had no involvement in the Friends & Family Account,[12] and Mr. Neff

and Mr. Young believed that they had their own separate account set up for them.  (Zundel Dep.

at 62:1-15.)

Finally, the investors themselves appear to have used the words "Friends & Family

Account" and "Blackbird" interchangeably when discussing the plan to move all of Mr. Kelley's

earlier investors from Blackbird to the X-1 account.  (See Neff Dep. at 43:10-18, 54:3-15, 130:2-

15; Young Dep. at 81:3-83:15, 84:14-25; Zoll Dep. at 84:15-23.)

All of this evidence demonstrates that Blackbird and the Friends & Family Account were

fully intertwined.  Many investors had inconsistent beliefs about where their money was or how

it was being invested.  And ultimately, all of the money, whether designated for the Friends &

Family Account, the Neff & Young Account, or Blackbird more generally, was mixed together

in the same bank account.  Despite the X-1 Investors' efforts to argue that Blackbird "was not

---

[12] Of course, at least some investors disagreed with Mr. Zundel's assertion that Mr. Shumway had no involvement with the Friends & Family Account.  Mr. Neff and Mr. Young both testified that Mr. Shumway's role at Blackbird included monitoring Mr. Kelley's Friends & Family Account trading.  (Neff Dep. at 176:2-20; Young Dep. at 23:2-25.)  Meanwhile, Mr. Zoll agreed that Mr. Shumway's involvement in the Friends & Family Account was "more limited," but nevertheless testified that there were times when he would discuss the progress of the Friends & Family Account with Mr. Shumway.  (Zoll Dep. at 69:2-10.)

connected to the Ponzi scheme discovered in the Friends & Family Account" (X-1 Obj. at 4), the court concludes that the two were intimately connected.

Accordingly, evidence that X-1 was part of Blackbird is by definition also evidence that X-1 was tainted by the Ponzi scheme from the Friends & Family Account.

### B. Unified Scheme

There is significant evidence that X-1 was simply an extension of the operation Mr. Kelley had previously run through Blackbird. In fact, X-1 was explicitly created for the purpose of replacing Blackbird.

The decision to launch a new entity was motivated by two events, one involving an acquaintance of Mr. Kelley named Jake Stocking and one involving an investor named Joe Johnson. First, in late 2015, a number of investors began to hear rumors that Mr. Stocking was being investigated for securities fraud and that his misconduct somehow involved Blackbird.[13] (S.E.C. Reply, Oliver Decl. ¶ 14, Ex. 12.) Mr. Stocking had allegedly been soliciting new investors for Blackbird but was pocketing the investors' money rather than depositing it into Blackbird's account. (Neff Dep. at 41:20-42:3; Zoll Dep. at 70:5-10.) This scandal gave "a black eye to Blackbird." (Zoll Dep. at 70:5-17.) The investors wanted to "set up a new company so it was clean, everything started fresh." (Neff Dep. at 41:16-19; Young Dep. at 68:19-69:3.)

Second, in early 2016, Mr. Kelley suffered significant trading losses, which he blamed on Mr. Johnson, an investor who had unexpectedly pulled all of his money out of Blackbird when he lost faith in Mr. Kelley's trading strategy. According to Mr. Kelley, such a sizeable withdrawal at that particular moment in time negatively impacted all of Mr. Kelley's trades.

---

[13] Mr. Stocking ultimately pled guilty to charges of securities fraud in June 2016. See U.S. v. Stocking, 2:16-cr-00107-DAK (Utah 2016).

(See Andrus Dep. at 16:20-17:16; Neff Dep. at 26:19-23; Young Dep. at 46:14-47:17.)  Some

investors testified that a new entity was needed to prevent similar losses from happening again.

(Andrus Dep. at 24:20-5; Zoll Dep. at 70:23-71:5.)[14]

Because of these two events, a group of Blackbird investors worked with Mr. Kelley and

Mr. Shumway to create X-1.  The sole owners of Blackbird were Mr. Kelley and Mr. Shumway.

(Neff Dep. at 35:13-36:2.)  The same was effectively true of X-1.  X-1 was owned by another

new entity called TradeTech Holdings and TradeTech, in turn, was owned by Mr. Kelley and

Mr. Shumway.  (Neff Dep. at 42:6-43:25.)[15]

X-1's business model was also identical to Blackbird's business model.  In both

instances, the investors' money was pooled together in one bank account before being turned

over to Mr. Kelley's trading account.  (Andrus Dep. at 23:15-17; Neff Dep. at 13:8-14; Zoll Dep.

at 100:12-18.)  The money was traded by Mr. Kelley, who claimed he was using his proprietary

algorithms to ensure a significant profit for the investors.  (Cash Dep. at 13:15-14:15; Neff Dep.

at 34:12-21.)  Mr. Kelley was "the brains behind it all."  (Cash Dep. at 15:16-24.)

Meanwhile, Mr. Shumway was also doing the same job as before.  (Neff Dep. at 55:6-8

("Q. [W]as Paul Shumway playing the same role for X-1 that he played for Blackbird?  A. Yes,

absolutely.").)  In both entities, Mr. Shumway's most important job was to hold the securities

license under which Mr. Kelley traded.  (Zoll Dep. at 26:18-27:6; Zundel Dep. at 24:19-25:16,

---

[14] It is unclear from the record whether this was the real cause of Mr. Kelley's losses.  The important thing, for the
purpose of this order, is that the X-1 Investors believed this to be the case and set up X-1 in response to that belief.
[15] Mr. Kelley had a 64% interest in TradeTech and Mr. Shumway had a 16% interest, meaning the two of them
controlled 80% of the company.  The remaining 20% was divided equally among Mr. Neff, Mr. Young, ZM
Consulting (which was Mr. Zoll's company), and another investor, Brandon Fry.  (Neff Dep. at 48:1-12; Zoll Dep.
at 88:11-89:9.)  Mr. Zoll referred to these four other owners as "nominal."  (Zoll Dep. at 75: 10-15.)  They were only
given an interest in TradeTech because of their earlier involvement in Blackbird, not because of any new
consideration provided.  (Young Dep. at 85:11-87:6; Neff Dep. at 47:5-25.)

56:12-21.)  Mr. Shumway was also repeatedly referred to as a compliance manager for both entities.  He was supposed to be monitoring all of the trades made by Mr. Kelley, both at Blackbird and at X-1.  (Neff Dep. at 33:5-19, 130:16-131:9; Young Dep. at 23:7-25:5; Zoll Dep. at 27:13.)

Because X-1 was meant to replace Blackbird, the plan was for all investors (including the Friends & Family Account investors) to eventually be moved from Blackbird to X-1 and for Blackbird to be dissolved.  Rather than move them all at once, the transition would be staggered.  (Neff Dep. at 54:3-15; 130:2-15; Young Dep. at 81:3-83:15, 84:14-25; Zoll Dep. at 84:15-23.)  Investors who had suffered losses at Blackbird were given an incentive to invest with X-1 because their new subscription agreements promised that Mr. Kelley would not charge any commission until they regained everything they had lost at Blackbird.  (Andrus Dep. at 21:7-25, 27:20-28:9; Neff Dep. at 45:2-14.)  One of the explicit goals in founding X-1 was to make whole all of the Blackbird investors who had suffered losses because of Mr. Kelley.  (Neff Dep. at 162:3-9, 165:4-8; Zoll Dep. at 102:7-15; Zundel Dep. at 81:1-22.)[16]

In sum, X-1 was owned by the same people as Blackbird, followed the same business model, engaged in the same kinds of transactions, was designed as a replacement for Blackbird, and was going to be used to compensate the investors who had lost money with Blackbird.  This is more than enough to conclude that X-1 and Blackbird were part of a unified scheme.

---

[16] The court is referring here to the investors' plan at the time X-1 was created in mid-2016.  By November 2016, just before Mr. Kelley's arrest, the investors learned that millions of dollars had been lost from Blackbird.  Mr. Zoll and Mr. Zundel both testified that, at that point in time, they began discussing how to use money from the X-1 account to cover the losses of the investors who had not yet moved over to X-1 from Blackbird.  (Zoll Dep. at 167:11-168:12, 169:14-170:15; Zundel Dep. at 120:21-123:4.)  But Mr. Neff denied that these discussions took place and claimed that they only discussed how to ensure the X-1 investors were protected; the Blackbird investors were, in his view, simply "stuck" with their losses.  (Neff Dep. at 104:8-106:15.)

The X-1 Investors respond that, despite the similarities, X-1 was different from Blackbird because new protocols and safeguards were imposed on X-1 to ensure that Mr. Kelley did not have the kind of opaque, unlimited control over its accounts that he had over the Blackbird account.  But the evidence cited by the X-1 Investors is unpersuasive.

First, there is at least some evidence that the investors who created X-1 did not really want to impose any new limitations on Mr. Kelley.  Some investors suggested in their depositions that X-1 was actually created to give Mr. Kelley <u>more</u> freedom, rather than less, because the investors were unhappy that the withdrawal of a single Blackbird investor (Mr. Johnson) had caused all Blackbird investors to suffer losses.  For example, Mr. Zoll told one investor, Brad Andrus, that creating X-1 would "allow Andrew [Kelley] to trade with fewer restrictions."  (Andrus Dep. at 24:20-5.)[17]  And while Mr. Zoll testified that one of the goals of X-1 was to "put[] proper protocols in place with subscription agreements and so forth," in the very same sentence he emphasized that doing so "would still allow [Mr. Kelley] more free trading capability."  (Zoll Dep. at 70:23-71:5.)

In any event, accepting that these statements are outliers, and assuming that X-1 really was meant to limit, rather than free, Mr. Kelley, the proposed limitations were superficial at best. There is conflicting evidence about who, exactly, was in charge of X-1.  Mr. Andrus testified that he did not know what made X-1 different from Blackbird, except that it would be up to Mr. Zoll

---

[17] <u>See also</u> Andrus Dep. at 25:6-22:
  Q.  Do you recall there being a discussion that Andrew needed fewer restrictions?
  A.  I do recall that.  This was, I believe as a result of Joe [Johnson] placing those restrictions on
      Andrew, that that was the excuse, whether it's valid or not, as to why Andrew suffered the losses in
      Blackbird.
  Q.  So your understanding is that Joe Johnson as an investor . . . had placed certain restrictions on . . .
      the trading that Andrew would do?
  A.  Yeah.  Joe would go to – and meet with Andrew when things were going sideways at Blackbird
      and met with him constantly and said that he was putting heavy restrictions on Andrew.  So this
      would be consistent with what Ray [Zoll] was talking about.

to "oversee" the X-1 account.  (Andrus Dep. at 22:1-10.)  Mr. Zoll, by contrast, said that it would

be up to Mr. Zundel to oversee X-1, though he evidently also envisioned a role for Mr.

Shumway.  (Zoll Dep. at 101:3-10 ("[M]y clear understanding was that Bryce [Zundel] would

control the funds independently and that . . . Andrew [Kelley] couldn't get ahold of those funds

without having to go through Bryce, who then would overlook, be overseen by [Mr.] Shumway,

who was the pilot.").)  Mr. Young agreed that Mr. Zundel was the person in charge.  His

understanding was that Mr. Zundel would "watch [Mr. Kelley] like a hawk" and that "there

[would] basically have to be like two signatures on anything, and Bryce [would] have to be one

of those signatures."  (Young Dep. at 81:16-17, 81:24-82:3.)

Consistent with this understanding, Mr. Zundel was ultimately named X-1's CFO.  (See

Zundel Dep. at 47:11-20.)  But in practice, he exercised almost no control over X-1.  In fact, it is

not even clear when Mr. Zundel began working for X-1.  The X-1 Investors assert in their

objection that Mr. Zundel began consulting for X-1 part-time in April 2016 and began working

as its full-time CFO on July 28, 2016.  (X-1 Obj. at 5-6.)  But during his deposition, Mr. Zundel

testified that he did not begin working for X-1 until September 7, 2016, and was not added to the

AFCU bank accounts until September 14, 2016.  (Zundel Dep. at 47:11-48:11.)

Once installed, Mr. Zundel failed to prevent direct wire transfers between X-1 and

Blackbird.  Mr. Zundel testified that he believed it was improper to transfer money directly from

Blackbird to X-1, and that Mr. Shumway also knew it was improper, but Mr. Shumway

nevertheless arranged for $100,000 to be transferred directly from Blackbird to X-1 without

discussing it with Mr. Zundel.  (Zundel Dep. at 51:2-9 ("Paul [Shumway] was very clear to me.

He says, you know, 'I can't transfer this over from Blackbird because it's a different entity.'

And so when it was brought up in the hearing about $100,000 being transferred from Blackbird into X-1, Paul shouldn't have let that happen.").)  Even more concerning, despite claiming that such practices were wrong, Mr. Zundel himself then did the exact same thing a few weeks later, when he personally instructed Mr. Kelley to wire another $26,000 directly from the Blackbird account to the X-1 account.  (Zundel Dep. at 52:8-53:5.)

There were similar problems with money going out of X-1.  For example, Mr. Zundel testified that X-1 paid approximately $20,000 to Mr. Zoll for legal services, but he could not explain whether those fees were for services that Mr. Zoll provided to X-1 or for services he provided to Blackbird.  (Zundel Dep. at 93:19-94:8.)  On another occasion, Mr. Shumway pulled $83,000 out of the X-1 account without Mr. Zundel's knowledge on Mr. Kelley's instructions. At his deposition, Mr. Zundel was not even sure whether that money went to Blackbird or to Mr. Kelley personally:

Q.  And what was that [transaction] for?

A.  Unbeknownst to me, Paul [Shumway] pulled out – Andrew [Kelley] told Paul to pull out $83,000 out of X-1 Technologies.

Q.  And when was that?

A.  I believe that was October.  So Paul had transferred it out.  And I asked Andrew about it.  And I says, "Andrew, why did you pull this out?"  Or asked Paul first.  And he said it's because he was reimbursing – because Blackbird?  Or either Andrew personally – I don't know how it had been taken . . . .  So unbeknownst to me – I think it was October – $83,000.  And he said that was to reimburse Blackbird for paying Gary Leavitt the previous months.

Q.  And the $83,000 was transferred to Paul Shumway?

A.  No.  Paul had transferred it.  Because Paul – Andrew couldn't – Andrew's name wasn't on the account.  Only mine and Paul's.

Q.  So where was it transferred to?

23

A.  I think it was transferred to Blackbird.  I think.

Q.  Which Blackbird?  The Chase account?

A.  Either that or Andrew directly.  I'd have to double check.  I don't know.  I just know that 83 was pulled out.  And I wasn't really happy about it, without me knowing about it.

(Zundel Dep. at 84:5-85:21.)

Similarly, in October and November 2016, X-1 paid a salary of $5,000 per month to a futures trader named Ryan Newby.  Mr. Zundel understood that Mr. Newby did not work for X-1; he worked for Blackbird.  Nevertheless, on Mr. Kelley's instructions, it was X-1 that paid Mr. Newby.  When asked what services Mr. Newby provided X-1, Mr. Zundel responded, "You'll have to ask Andrew.  I don't know."  (Zundel Dep. at 71:9-74:9; see also Zoll Dep. at 117:21-24 ("Q.  Was [Mr. Newby] ever involved with X-1 to your knowledge?  A.  I remember his name, but I don't know him being involved with X-1 in any official capacity.").)

Finally, the court notes that while Mr. Zundel had access to X-1's bank account at AFCU, he had no access to X-1's trading account at Advantage Futures.  That was left to Mr. Shumway.  (Zundel Dep. at 112:10-22.)  Because of this arrangement, Mr. Shumway was able to unilaterally transfer $900,000 from the trading account back to the X-1 bank account when he learned that Mr. Kelley had been arrested.  He did so "without talking to anybody else" because he was "stressed" and "nervous" about the arrest.  (Zundel Dep. at 115:8-117:25.)  Although pulling the money out of the trading account and putting it into the bank account may have been a responsible action in light of Mr. Kelley's arrest, it is further proof that Mr. Shumway, not Mr. Zundel was running X-1.

24

In sum, under the new protocols and safeguards that the X-1 Investors established to distinguish X-1 from Blackbird, money was transferred directly from Blackbird to X-1, sometimes without the knowledge of the CFO, Mr. Zundel, and sometimes at his request, even though he testified that such transfers were inappropriate.  Money was paid to Mr. Newby on Mr. Kelley's orders, even though Mr. Newby did not work for X-1.  Money was paid to Mr. Zoll, and the CFO did not know why.  Mr. Shumway unilaterally transferred more than $80,000 out of the X-1 account, either to Mr. Kelley or Blackbird (Mr. Zundel wasn't sure which), again on Mr. Kelley's instructions.  And Mr. Shumway unilaterally shut down all trading once Mr. Kelley was arrested by moving $900,000 out of the X-1 trading account and back into the X-1 bank account.

Clearly, the controls and limitations put in place at X-1 in no way hampered Mr. Kelley from doing whatever he wanted with this money.  Sometimes it was Mr. Zundel who accessed the X-1 account on Mr. Kelley's instructions and sometimes it was Mr. Shumway who acted on Mr. Kelley's behalf, but for all intents and purposes, Mr. Kelley remained in control of the X-1 account and treated it as interchangeable with Blackbird's account.  From this, the court concludes that Blackbird and X-1 were both part of a unified scheme.

### C.  Similarly Situated Victims

The court also concludes that the Blackbird investors and the X-1 investors were similarly situated.  Much of the evidence cited above applies to this factor as well.  For example, in both instances, investors were relying on Mr. Kelley's trading algorithms to obtain astronomical returns on their investments.  And investors in both Blackbird and X-1 placed their funds in a single, pooled bank account for Mr. Kelley to use for trading.

Additionally, not only were the Blackbird and X-1 investors similarly situated, they were in many instances the same people.  Eight of the eighteen individuals or entities that invested in X-1 had previously invested in Blackbird: Mr. Andrus, Mark Burgess, Stewart Burgess, Clancy ROAC, LLC, Mr. Stockwell, Tee & See Marketing, Mr. Zoll, and Mr. Zundel.  (Andrus Decl. ¶¶ 2-3 (ECF No. 140-1); Comer Decl. ¶¶ 3-4 (ECF No. 140-2); Burgess Decl. ¶¶ 2-3 (ECF No. 140-3); Stockwell Decl. ¶¶ 2-4 (ECF No. 140-4); Neff Dep. at 122:6-17; Young Dep. at 91:2-16; Zundel Dep. at 81:1-4.)  And Mr. Neff and Mr. Young, two other Blackbird investors, had a small ownership interest in X-1 through the TradeTech Holdings entity.  (See Neff Dep. at 48:1-12; Zoll Dep. at 88:11-89:9.)  Moreover, as discussed above, had Mr. Kelley not been arrested, the plan was to eventually wind down Blackbird in its entirety and move all Blackbird investors over to X-1, with the goal of helping those investors recover all of the losses they had experienced while at Blackbird.  (Neff Dep. at 54:3-15, 130:2-15, 162:3-9, 165:4-8; Young Dep. at 81:3-83:15, 84:14-25; Zoll Dep. at 84:15-23, 102:7-15.)

Accordingly, the court concludes the X-1 Investors were similarly situated to the Blackbird investors.

### D.  Commingling of Assets

Finally, the court concludes that that there was a commingling of assets between Blackbird and X-1.  The S.E.C. has identified two types of commingling here: Improper transfers from Blackbird to X-1 and improper transfers from X-1 to Blackbird.

In the first category, Blackbird transferred $100,000 to X-1 on July 26, 2016; $62,000 to X-1 on August 29, 2016; and $25,309.60 to X-1 on September 20, 2016.  (S.E.C. Reply at 21-

23.)[18]  The X-1 Investors' argue that these transfers were individual investments by Mr. Andrus, Tee & See Marketing, and Clancy ROAC in X-1.  These three investors had all previously deposited funds into Blackbird's account and then requested that their investments be transferred to X-1.  A direct wire from Blackbird to X-1 was believed to be the simplest way to achieve that goal.  (X-1 Obj. at 8.)

In the second category, X-1 transferred $83,000 to Blackbird's account on October 7, 2016.  (Zundel Decl. ¶ 31.)  The X-1 Investors argue that this was to pay back Blackbird for $82,350 that it had previously paid out to Mr. Newby and Gary Leavitt, X-1's COO.  Although these individuals had originally been paid by Blackbird, the payments had been made on X-1's behalf, and so X-1 had to compensate Blackbird.  (Id.)

The fact that the X-1 Investors are able to provide innocent explanations for these transfers is irrelevant.  As discussed at length in S.E.C. v. Bivona, "it is unnecessary to determine whether Defendants diverted funds in an unlawful manner. . . . What matters is whether there is a shortage of assets [to distribute to the defrauded victims], not necessarily the reasons for the shortage.  Whether a shortage results from unlawful conduct does not change the fact that there are insufficient funds to fully compensate all investors.  And when funds are limited, hard choices must be made."  Bivona, 2017 WL 4022485 at *9.  In other words, commingling is evidence that Blackbird and X-1 were part of the same scheme regardless of any explanation the X-1 Investors offer to justify the commingling, and in such situations, it is often appropriate to use all funds, wherever located, to compensate defrauded investors.

---

[18] Unless another source is cited, all of the financial information in this section is drawn from the S.E.C.'s Additional Statement of Facts Nos. 19 through 31, which the X-1 Investors do not dispute.  (See X-1 Sur-Reply at 10) ("The X-1 Investors do not dispute the facts stated regarding what deposits and transfers were made at what time.  The financial records speak for themselves as to the timing and amounts of the deposits and transfers.").)

It is also irrelevant that the amount of commingling was relatively small, given the size of the investments.  "[D]ue to the fungibility of money, <u>any</u> commingling is enough to warrant treating all the funds as tainted."  <u>Byers</u>, 637 F. Supp. 2d at 177 (emphasis in original); <u>see also</u> <u>Bivona</u>, 2017 WL 4022485 at *9 ("[O]nce moneys are combined, disaggregation is somewhat arbitrary and disentanglement challenging. Thus, even the presence of some tainted funds in a commingled account is sufficient to taint legitimately-acquired funds") (internal quotations omitted); <u>S.E.C. v. Sunwest Mgmt., Inc.</u>, Case No. 09-6056-HO, 2009 WL 3245879 at *9 (D. Or. 2009) ("Commingling need not necessarily be systematic to justify" a pro rata distribution).

Here, the evidence shows that between June 28, 2016, and September 20, 2016, over $800,000 was moved into Blackbird's account.  In the same time period, roughly the same amount was transferred out of the account to other individuals and entities.  (See S.E.C. Reply, Ex. A., Oliver Decl. ¶ 8, Ex. 6.)  A small portion of the incoming amount came from Mr. Andrus, Tee & See Marketing, and Clancy ROAC, and a small portion of the outgoing amount went to X-1, but because money is fungible, it is not really accurate to claim that the money Blackbird moved into the X-1 account belonged to Mr. Andrus, Tee & See Marketing, and Clancy ROAC, even if the X-1 Investors have tried to account for the money in that way. Similarly, it is not really accurate to say that the $83,000 that X-1 sent to Blackbird was a repayment of money that Blackbird had given to Mr. Leavitt and Mr. Newby, again because such large sums of money from other sources were coming into and going out of the account.  In short, regardless of why or how much, the evidence shows that Blackbird and X-1 funds were repeatedly commingled.

Notwithstanding the above, the court briefly notes that even if the motive for the commingling did matter, the X-1 Investors' explanations do not actually seem entirely innocent. First, as noted above, the individuals who authorized the wire transfers from Blackbird to X-1 knew that doing so was a bad idea.  (Zundel Dep. at 51:2-9, 52:8-53:5.)  Second, it is unclear why Clancy ROAC invested money with Blackbird in the first place, rather than invest it directly with X-1.  While Mr. Andrus and Tee & See Marketing's investments in Blackbird were made before X-1 was up and running, Clancy ROAC invested in Blackbird more than a month after other investors had already begun making direct deposits in X-1's account.  (Compare X-1 Obj. at 5-7 with S.E.C. Reply at 22-23.)   The X-1 Investors have not explained why one of its investors would deposit money into Blackbird if the investor was trying to invest in X-1.  One plausible inference is that Clancy ROAC viewed Blackbird and X-1 as interchangeable.

Third, and most troublesome, the X-1 Investors contend that a portion of the $83,000 sent by X-1 to Blackbird was to compensate Blackbird for payments it had made to Mr. Newby between April and September 2016.  Yet no one has been able to explain what services Mr. Newby provided that would warrant him receiving any kind of salary from X-1.  (Zundel Dep. at 71:5-74:21 ("Q. And you don't know why X-1 was paying him a salary?  A.  I don't."); Zoll Dep. at 117:21-24 ("Q. What about Ryan Newby? Was he ever involved with X-1 to your knowledge? A. I remember his name, but I don't know him being involved with X-1 in any official capacity.").)  When asked about this arrangement at the hearing, counsel for the X-1 Investors similarly could not explain why Blackbird was paying Mr. Newby for services that he was supposedly providing to X-1.

In sum, not only were the Blackbird and X-1 accounts commingled, they were commingled for inexplicable or suspicious reasons.

For all of the above reasons, the court concludes that X-1 and Blackbird were part of a unified scheme, that the investors involved in both X-1 and Blackbird were similarly situated (and, at times, identical), and that funds between X-1 and Blackbird were frequently commingled. Given this relationship between X-1 and Blackbird, the court concludes the S.E.C. is right to include the X-1 funds as part of its distribution plan. Accordingly, the X-1 Investors' objection to the S.E.C.'s distribution plan is OVERRULED.

### ORDER

1. The objection of Shane Stockwell (ECF No. 126) is SUSTAINED. The S.E.C. is ordered to amend their distribution plan to take into account Mr. Stockwell's additional claim.

2. The objections of Bryce Zundel, Robert Zoll, and the X-1 Investors (ECF Nos. 125, 129, 130) are OVERRULED.

3. The S.E.C.'s Motion to Appoint Distribution Agent and Approve Distribution Plan (ECF No. 117) is GRANTED.

4. Noel Gittens, Esq., an S.E.C. employee, is appointed as Distribution Agent.

5. The funds will be distributed in accordance with the Distribution Plan, which is approved by this court (subject to the amendment ordered above).

6. The Distribution Agent shall perform such functions as are necessary to implement and administer the approved Distribution Plan, pursuant to which monies in the Distribution Fund (minus tax obligations, BFS fees, fees and expenses of the Tax

Administrator, and fees and expenses of the Third Party who will be assisting the Distribution Agent with administrative tasks in connection with implementing the Distribution Plan) shall be distributed to Eligible Investors on a pro rata basis, as provided for in the Distribution Plan.

7.   The Distribution Agent shall be deemed to be acting within the scope of his employment with the S.E.C. in administering this Distribution Fund.  In carrying out his duties, the Distribution Agent may be assisted by a Third Party and other S.E.C. staff acting under his supervision.

8.   The Distribution Agent shall receive no compensation for the services performed in administering the Distribution Fund, other than his regular salary as an employee of the S.E.C.

9.   The Distribution Agent shall coordinate with the court-appointed Tax Administrator, Miller Kaplan Arase LLP, to ensure that the Distribution Fund, a Qualified Settlement Fund ("QSF") under § 468B(g) of the Internal Revenue Code, and related regulations pertaining to QSFs, 26 C.F.R. §§ 1.468B-1 through 5, complies with the legal and regulatory requirements imposed on distributions from the Distribution Fund.

10.  The Distribution Agent may be removed sua sponte at any time by the court or upon motion of the S.E.C. and replaced with a successor.

11.  The Distribution Agent and his designees, agents, and assistants are not required to post a bond, and shall not be liable to any person for their actions hereunder, except on a finding of willful disregard of duty.

12. The Distribution Agent will submit a final report describing the distribution made to the court prior to seeking termination of the Distribution Fund and discharge of the Distribution Agent.  In the unlikely event that a check is not cashed, those funds will be transferred to the U.S. Treasury.

13. The Distribution Agent is ordered to submit a status report by February 1, 2021, if the final report has not been completed by that date.

SO ORDERED this 30th day of July, 2020.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge